UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

TAJA HIRATA-EPSTEIN,
   Plaintiff,

v.

BROWN UNIVERSITY,
   Defendant.

C.A. No. 23-047-JJM-PAS

MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Plaintiff Taja Hirata-Epstein was a student at Brown University when she experienced back-to-back incidences of sexual harassment by two students at Brown with whom she was romantically involved. She reported these incidents to Brown, whose Title IX Office responded and worked with her on an acceptable outcome. Unsatisfied with Brown's response, Ms. Hirata-Epstein sued Brown, alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681-88, and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112 *et seq.*, along with several state law claims. After motion practice reduced Ms. Hirata-Epstein's case to three Title IX counts (I-III), one RICRA count (XI), and a state law Intentional Infliction of Emotional Distress (IX) ("IIED") claim, Brown moves for summary judgment on all remaining claims. ECF No. 75.

I.    BACKGROUND

The facts here are largely undisputed.

Ms. Hirata-Epstein began a relationship with John Doe in October 2017.[1] ECF No. 78 ¶ 15. She was a sophomore, and he was a junior; they were in the same co-ed fraternity, and both lived in Marcy House on campus. *Id.* ¶ 16. The relationship deteriorated and ended less than a year later in the summer of 2018. *Id.* ¶ 25. Upon returning for her junior year (and Mr. Doe's senior year), Ms. Hirata-Epstein told other members of their fraternity that he had sexually harassed her. *Id.* ¶ 29. Mr. Doe's friends responded by pressuring her not to report him. *Id.* ¶ 75. She was seeing Dr. Ruggles from the SHARE program and, with her consent, he contacted Associate Dean Cynthia Ellis, Ph.D. to report Mr. Doe's harassment who then reported it to Brown's Title IX Office. *Id.* ¶¶ 30-31, 34.

In their conversations, Ms. Hirata-Epstein told Dean Ellis that she wanted to move off campus. *Id.* ¶ 35. Dean Ellis contacted Brown's Office of Residential Life to find her a suitable situation but denied her request to move off campus.[2] *Id.* ¶ 36. She was offered a single in a suite in another dorm. *Id.* ¶ 43. Things had improved at Marcy House because the fraternity forced Mr. Doe to move out, so Ms. Hirata-Epstein declined Brown's alternative housing. *Id.* ¶¶ 45-48.

---

[1] Ms. Hirata-Epstein began speaking with Brown SHARE (Sexual Harassment and Assault Resources and Education) Advocate, Dr. Elliott Ruggles in the Fall Semester of 2017 to help her understand issues of consent and interactions in her relationship with Mr. Doe. *Id.* ¶ 20. The SHARE program provides students with a confidential resource and any information a student shares is not shared with Brown. *Id.* ¶¶ 21-23.

[2] Brown's housing policy is that students are required to live on campus until their senior year. Juniors would have to participate in a lottery to potentially be allowed to move into off campus housing. Ms. Hirata-Epstein did not choose to go into the lottery, electing to remain in Marcy House. *Id.* ¶ 50.

Due to an apparent clerical glitch with Dean Ellis's report to the Title IX Office, Ms. Hirata-Epstein did not hear from anyone in that office for twelve days. *Id.* ¶¶ 55-58. Once she did hear, she did not respond to the Title IX Program Officer, Rene Davis, for approximately a month; she testified that she was continually harassed during that time by Mr. Doe's friends and was confused about whether she had a reportable claim. *Id.* ¶ 61. When Ms. Hirata-Epstein and Ms. Davis finally spoke, they discussed both the informal and formal complaint processes; she ultimately decided to file an informal complaint. *Id.* ¶¶ 66-69, 71-81. She and Ms. Davis also discussed conditions such as requiring Mr. Doe to participate in a "masculinity course" and drafting a no-contact order to prevent Mr. Doe from entering Ms. Hirata-Epstein's residence hall. *Id.* ¶ 101. While ultimately the order did not include these conditions, Ms. Hirata-Epstein approved the terms of the no-contact order, and it was entered. *Id.* ¶¶ 89-91.

Throughout this fall 2018 semester, Ms. Hirata-Epstein treated with a licensed mental health counselor, Michelle Vitale, and Brown University Health Services for, among other things, anxiety, depression, PTSD, and a preexisting eating disorder. Over her winter break at home, she decided not to study abroad during spring semester of her junior year. *Id.* ¶ 85. Ms. Hirata-Epstein requested that she be allowed to move into her friend's dorm room. *Id.* ¶ 80. Ms. Davis worked with Residence Life to honor Ms. Hirata-Epstein's dorm move request and the no-contact order was in effect when she returned to campus in January. *Id.* ¶¶ 81, 88, 94. Ms. Davis met with Mr. Doe to review the terms of the no-contact order. *Id.* ¶¶ 99-

100. She told Ms. Hirata-Epstein that she would discuss counseling with Mr. Doe and that he should avoid her new dorm. *Id.* ¶ 102.

Ms. Hirata-Epstein testified that Mr. Doe's friends continued to harass her, and she did not feel safe on campus, but she did not inform Brown that John's friends or any other Brown student were bothering her on campus. *Id.* ¶ 113. During Mr. Doe's remaining time at Brown, both he and Ms. Hirata-Epstein reached out to the Title IX Office to ask whether attending certain events on campus would violate the order's terms. *Id.* ¶¶ 102-04, 106-07. Ms. Davis investigated and promptly responded in order to ensure compliance. *Id.* It is undisputed that Brown never received a report that either Mr. Doe or Ms. Hirata-Epstein violated the order. *Id.* ¶¶ 108-12.

Soon after she reported her allegations against Mr. Doe to the Title IX Office during her junior year, Ms. Hirata-Epstein began a relationship with fellow junior, James Roe. *Id.* ¶ 62. The relationship finally ended[3] two months after they both graduated when she returned to Providence to move out of her apartment.[4] *Id.* ¶¶ 139-42. It is undisputed that Ms. Hirata-Epstein never reported any inappropriate conduct by Mr. Roe to Brown during the entire course of their relationship. *Id.* ¶¶ 82-83, 123, 126.

---

[3] Ms. Hirata-Epstein now argues that her relationship with Mr. Roe was unhealthy, but she was so upset with how the informal process was proceeding in her case against Mr. Doe that she became dependent on Mr. Roe and could not end it.

[4] The COVID-19 pandemic interrupted Ms. Hirata-Epstein's senior year—she returned home in March 2020 and finished the year remotely. She did not have a commencement ceremony that May and only returned to Providence in June 2020 to move out of her apartment.

4

When she reported Mr. Roe's abuse to the Title IX Office in July 2020 after she returned to her home in Hawaii, Ms. Davis discussed several different courses of action, including reporting Mr. Roe to the police. *Id.* ¶¶ 144-46, 151, 158. Ms. Davis reviewed Ms. Hirata-Epstein's concerns and concluded that Brown's policies did not reach allegations against former students who were no longer affiliated with the University. *Id.* ¶ 157. When graduation was rescheduled and Ms. Hirata-Epstein requested restrictions against Mr. Roe, Brown explained that it could not take any action against him because he was no longer a student. *Id.* ¶¶ 173-74. He was not placed in the same dorm as her but was in the one next to hers. *Id.* ¶ 178. She testified that she felt unsafe throughout the weekend and, as such, did not participate in any graduation events. *Id.* ¶ 181. Ms. Hirata-Epstein reports continued mental health issues and life struggles due to her experiences at Brown.

## II.   STANDARD OF REVIEW

A party is entitled to summary judgment if the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A party can show a genuine dispute by citing to materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by showing that the materials cited either do not establish a genuine dispute or are not supported by admissible evidence. *Id.* Summary judgment is mandated against a party who, given adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element

essential to that party's case ... on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A complete failure of proof of an essential element shows that there is "no genuine issue as to any material fact" because if one element fails, all other facts are rendered irrelevant; it entitles the moving party to "judgment as a matter of law" because, by definition, the nonmoving party cannot carry their burden at trial. *Id.* at 323.

III. DISCUSSION

Brown argues in its motion that there are no material issues of disputed fact on Ms. Hirata-Epstein's remaining claims for gender discrimination and IIED such that this Court should decide in its favor as a matter of law. Ms. Hirata-Epstein argues that there are many material disputes in this case that are better suited to a jury's determination. The law the Court is to apply here is generally not in dispute. The Court's brief discussion of the guiding legal principles and its highlighting of the material facts in the record follows.

    A.    Title IX (Counts I, II, III) and RICRA (Count XI)[5]

To succeed on a "deliberate indifference" claim, a plaintiff must show that (1) "she was subject to 'severe, pervasive, and objectively offensive' sexual harassment";

---

[5] Rhode Island courts look to federal law in construing their analogous civil rights statutes, *Doe v. Brown Univ.*, 43 F.4th 195, 206 (1st Cir. 2022); *see Colman v. Faucher*, 128 F. Supp. 3d 487, 491 n.8 (D.R.I. 2015) (citing *Casey v. Town of Portsmouth*, 861 A.2d 1032, 1037 (R.I. 2004)), so the Court will analyze these claims together.

(2) "the harassment caused the plaintiff to be deprived of educational opportunities or benefits"; (3) the funding recipient was aware of such harassment; (4) the harassment occurred "in [the funding recipient's] programs or activities"; and (5) the funding recipient's response, or lack thereof, to the harassment was "clearly unreasonable." *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644-50 (1999)).

"[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference; in the Title IX context, 'funding recipients are deemed deliberately indifferent to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Id.* at 73 (quoting *Davis*, 526 U.S. at 648). Deliberate indifference is a "stringent standard of fault, requiring proof that a[n] . . . actor disregarded a *known or obvious* consequence of his action" or inaction. *Bd. of the Cnty Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) (emphasis in original).

Brown assumes without conceding that Ms. Hirata-Epstein has met the first four elements and argues that its response was not clearly "unreasonable in light of the known circumstances," that is, it was not deliberately indifferent to Ms. Hirata-Epstein's reports of sexual harassment. The Court looks to the undisputed facts in the record of what Brown did in response to Ms. Hirata-Epstein's reports against both Mr. Doe and Mr. Roe. As to Mr. Doe:

- Ms. Hirata-Epstein reported Mr. Doe's conduct to Dean Ellis on October 5, 2018;

7

- Dean Ellis gave her supportive resources and informed the Title IX Office;

- Dean Ellis contacted the Office of Residential Life to help Ms. Hirata-Epstein move out of Marcy House where she said she felt uncomfortable;

- Residential Life offered her the chance to move to another dorm, which she declined;

- While Dean Ellis was working with her, the Title IX Office contacted her on October 17, 2018, offering to meet with her and sent her a list of supports; she did not respond

- Ms. Davis from the Title IX Office reached out again on October 31, 2018; Ms. Hirata-Epstein did not respond for over two weeks;

- Ms. Davis met with her on November 20th and December 18th;

- Ms. Davis, along with SHARE, developed resources to help her if she decided NOT to go abroad;

- After deciding not to go abroad in the spring of 2019, Ms. Hirata-Epstein asked to be moved to another dorm;

- During winter recess, Ms. Davis arranged for the dorm change and sent her the no-contact order terms, which she approved;

- Ms. Davis assisted her in filing an informal complaint; and

- The Title IX Office was in contact with her after the order issued—both Mr. Doe and Ms. Hirata-Epstein inquired about their ability to attend school events.

The Court cannot say that these undisputed facts support a finding of deliberate indifference.

As for her reports about Mr. Roe, Ms. Hirata-Epstein argues that Brown's deliberate indifference to Mr. Doe's harassment caused her to become dependent on Mr. Roe despite his abuse because she felt unsafe on campus because of Mr. Doe. She cites language from *Davis v. Monroe County Board of Education* to argue that Brown's conduct caused her to be vulnerable to further actionable sexual harassment. 526 U.S. at 644-45. The problem with Ms. Hirata-Epstein's position now is that she never reported Mr. Roe's abuse until two months after they graduated, so Brown did not know of any danger Mr. Roe posed to Ms. Hirata-Epstein while they were students at Brown. She only reported that she experienced violence and abuse at Mr. Roe's hands after they both had officially graduated. As a matter of law, Brown cannot be deliberately indifferent to acts of harassment about which it had no knowledge. *Id.* at 633.

Ms. Hirata-Epstein also argues that Brown was deliberately indifferent relating to her attendance at her delayed graduation weekend because it did not limit Mr. Roe's participation.[6] To prove her Title IX claim arising out of that weekend, Ms. Hirata-Epstein must first show that she was subject to "severe, pervasive, and

---

[6] The Court notes that Ms. Hirata-Epstein informed Brown about Mr. Roe's conduct after both had graduated and left Brown's campus. It is unclear from the record why, but the Court presumes it was because Brown no longer exercised any control over either of them, it did not investigate Ms. Hirata-Epstein's report, speak with Mr. Roe or any other witnesses, or conduct a hearing. Barring Mr. Roe from graduation weekend without giving him the benefit of an opportunity to speak for himself or present witnesses on his behalf could be deemed a violation of his rights.

objectively offensive" sexual harassment. It is undisputed, however, that Ms. Hirata-Epstein and Mr. Roe did not cross paths and there is no evidence that Mr. Roe sexually harassed her that weekend. Therefore, her claim relating to Mr. Roe's conduct fails on the first element.

Ms. Hirata-Epstein now asserts she wanted Brown to do more. She wanted Brown to order Mr. Doe to go to counseling, to allow her to move off campus during her junior year, and to include in the no-contact order[7] that Mr. Doe could not enter her new residence hall. She focuses on how Brown's failure to limit Mr. Roe's participation in graduation weekend in the face of her reports from two years earlier was clearly unreasonable. She argues that she asked for safety accommodations and Brown's refusal was deliberately indifferent to her reports of Mr. Roe's previous harassment.

But "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by [students]. The test is objective–whether the institution's response, evaluated in light of the known circumstances, is so deficient as to be clearly unreasonable." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007). In light of this standard, the Court cannot say that Brown's conduct, once it learned of Ms. Hirata-Epstein's reports of harassment, was "so lax, so misdirected, or

---

[7] Ms. Hirata-Epstein was given a draft of the no-contact order and the opportunity to comment on its terms before it was signed and enforced. She made no changes or additions and agreed to its terms. It is undisputed that neither Ms. Hirata-Epstein nor Mr. Doe reported violations of the order.

so poorly executed as to be clearly unreasonable under the known circumstances." *Id.* at 175. In fact, the record is undisputed that quite the opposite was true. Brown appropriately reacted to Ms. Hirata-Epstein's reports in a thorough and timely fashion. Nothing that Brown did or refused to do leading up to and during graduation weekend caused her to be sexually harassed. Did Brown's conduct cause her to make different choices on how to spend that weekend? Did she feel fearful or anxious because of her experiences with Mr. Roe? Even though the answer to those questions may be "yes," that does not make Brown's actions deliberately indifferent. Based on the undisputed facts, the Court finds that no reasonable jury could find that Brown was deliberately indifferent to Ms. Hirata-Epstein's reports about Mr. Doe or Mr. Roe.

B.   Intentional Infliction of Emotional Distress

"To create liability for intentional infliction of emotional distress in Rhode Island, '(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.'" *Doe v. Brown Univ.*, 43 F.4th 195, 209 (1st Cir. 2022) (quoting *Swerdlick v. Koch*, 721 A.2d 849, 862 (R.I. 1998)). To find liability, Brown's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004) (quoting Restatement (Second) Torts § 46 (1965)). A plaintiff must also show some "physical symptomatology

11

resulting from the alleged improper conduct." *Vallinoto v. DiSandro*, 688 A.2d 830, 838 (R.I. 1997) (citing *Reilly v. United States*, 547 A.2d 894, 898 (R.I. 1988)).

The Court is aware of the First Circuit Court of Appeals' decision in *Doe v. Brown University*, reversing a grant of summary judgment on a Brown student's IIED claim. 43 F.4th at 210. In that case, the court considered the parties' relationship, the fact that Brown faculty members were aware of the plaintiff's "enhanced susceptibility to extreme emotional distress," and determined that a jury could find that Brown's attempt to coerce him into withdrawing by piling on charges against him while he was vulnerable and stressed "went beyond all bounds of decency." *Id.* That is not the case here.

Even considering the parties' relationship, Ms. Hirata-Epstein has not pointed to any evidence in the record that could rise to this high standard. There is no question that the events she experienced with Mr. Doe and Mr. Roe were hard on her emotionally, but the undisputed facts in the record do not support a finding that Brown is liable for IIED for the way it handled those experiences.

When Ms. Hirata-Epstein first reported Mr. Doe's harassment, Dean Ellis supported her in multiple ways, specifically related to making sure she had housing where she would feel safe. And while she wanted to be allowed to move off campus as a junior, Ms. Hirata-Epstein was offered an alternative living assignment so that she could move out of the house where she felt uncomfortable, which she ultimately declined. Ms. Davis also provided support and assistance to Ms. Hirata-Epstein, such as additional housing changes, helping her pursue an informal Title IX process, and

implementing an agreed-to no-contact order between Ms. Hirata-Epstein and Mr. Doe, during the months following her report of his actions. Brown arranged for Ms. Hirata-Epstein to move into another dorm with a friend in the spring of 2019 when she decided to return to campus rather than studying abroad.

Moreover, Brown did not know about Mr. Roe's abusive behavior toward her while they were students. When Ms. Hirata-Epstein contacted the Title IX Office after she left Providence to inform them about his abuse and expressed concern about seeing him upon her return to campus for graduation activities,[8] Ms. Davis was supportive and helpful, alerting her to resources external to Brown since Brown's policies no longer applied to Mr. Roe. Ms. Davis even attempted to contact him to inform him of Ms. Hirata-Epstein's concerns, but his contact information had changed. *Id.* ¶ 166. Ms. Hirata-Epstein attended her graduation weekend at Brown and participated in the activities as she chose.

Ms. Hirata-Epstein believes that Brown's conduct was extreme and outrageous toward her; Ms. Davis should have done more or addressed her report against Mr. Doe differently during her junior year and Mr. Roe should have been barred from his delayed graduation weekend. She believes that Brown's attacks on her IIED

---

[8] The operative amended complaint was filed in January 2022 and the rescheduled Brown graduation for Ms. Hirata-Epstein's class took place in May 2022. ECF No. 15. While Ms. Hirata-Epstein argues that there are allegations in the complaint that cover the graduation events, she did not amend her complaint to include specific allegations of Brown's conduct leading up to and including graduation weekend. In any event, the Court finds that the undisputed facts here do not support an IIED claim.

claim go to her credibility, an area reserved for the jury's judgment. The Court disagrees on both fronts. Ms. Hirata-Epstein's credibility is not dispositive here in light of the undisputed evidence of what Brown actually did. The way Brown chose to handle Ms. Hirata-Epstein's reports of sexual harassment and to support her after those reports, was not intentional or in reckless disregard of causing her emotional distress. No evidence shows that Jane had an "enhanced susceptibility to emotional distress" or that Brown knew of it then and chose to act in a way that was outrageous and beyond the bounds of decency. *Doe v. Brown University*, 43 F.4th at 210. The Court grants summary judgment to Brown on Ms. Hirata-Epstein's IIED claim.

## IV. CONCLUSION

Because the parties agree on the law governing this case and the Court has concluded that Ms. Hirata-Epstein has not pointed to material disputed facts in this record that require a jury's consideration, and it is clear that Brown is entitled to judgment as a matter of law, the Court finds that summary judgment for Brown is appropriate on all remaining counts (I, II, III, IX, XI). The Court GRANTS Brown's Motion for Summary Judgment. ECF No. 75.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief Judge
United States District Court

March 14, 2025